UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| E.B., D.W. AND T.R., ON BEHALF OF THEMSELVES AND OTHERS SIMILARLY SITUATED | CIVIL ACTION |
| VERSUS | NO. 19-862-JWD-SDJ |
| JEFF LANDRY, DOUG WELBORN AND HILLAR C. MOORE, III | |

**ORDER**

Before the Court is a Motion to Proceed Anonymously (R Doc. 3), filed by Plaintiffs. Defendants oppose the Motion. (R. Doc. 28). For the reasons that follow, Plaintiffs' Motion is **GRANTED**.

I.   **BACKGROUND**

Louisiana law provides a legal process for its citizens with criminal histories to expunge "certain arrests and conviction records," removing them from the public record. La. C. Crim. P. art. 971(1). Recognizing that the "inability to obtain an expungement can prevent certain individuals from obtaining gainful employment," the "intention of the legislature" was that expungement would "provide opportunities to break the cycle of criminal recidivism, increase public safety, and assist the growing population of criminal offenders reentering the community to establish a self-sustaining life through opportunities in employment." La. C. Cr. P. art. 971(4), (6).

Plaintiffs (and the proposed plaintiff class members)[1] allege that Defendants' application of the law makes expungements prohibitively unaffordable by imposing the maximum fee allowed and making no exception for indigent citizens. (R. Doc. 1). Plaintiffs represent that events in their criminal histories have precluded them from obtaining gainful employment and limit their housing options. Although these events qualify for expungement, they remain on Plaintiffs' criminal records because Plaintiffs cannot afford the imposed fees. (R. Doc. 1-1 at 1) (E.B. claims it would cost between $1,650 and $2,200 for expungement); (R. Doc. 1-2 at 1) (D.W. claims $2,200 in expungement costs); (R. Doc. 1-3 at 1) (T.R. represents expungement costs of $4,950). In their lawsuit, Plaintiffs claim that, by basing access to expungement on "wealth-status, Defendants discriminate against indigent individuals" in violation of the Equal Protection and Due Process clauses of the United States Constitution. (R. Doc. 1 at 3). They seek "declaratory and injunctive relief prohibiting the conditioning on the availability of expungement on someone's ability to pay." (R. Doc. 1 at 3).

Plaintiffs are identified only by their initials in the Complaint (R. Doc. 1) and have since filed the instant Motion to Proceed Anonymously (R. Doc. 3). Although they recognize that "named plaintiffs typically proceed under their full names," Plaintiffs argue that "doing so in this case would cause a serious substantial harm of exactly the type that Plaintiffs already suffer as a result of their unexpunged criminal records" and that "proceeding under their full names would seriously undermine" any remedy they might obtain. (R. Doc. 3-1 at 2). Plaintiffs point out that using their full names in this lawsuit "would put the exact information they seek to expunge within

---

[1] Plaintiffs filed a Motion to Certify Class and Subclass of Plaintiffs (R. Doc. 16), as well as a Motion to Certify Two Classes of Defendants (R. Doc. 17). Both Motions have been denied without prejudice as premature. (R. Doc. 44 at 4) (noting Plaintiffs' right to re-file following the Court's resolution on the pending Motions to Dismiss). As of this Order, Plaintiffs have not filed any renewed motions seeking class certification. Nonetheless, the Court still considers the potential for class certification because the issue is raised by the parties in connection with anonymity and may potentially be sought again by Plaintiffs.

reach of a simple internet search by an employer or landlord." (R. Doc. 3-1 at 2). Defendants oppose the Motion, suggesting that Plaintiffs' "argument that merely bringing to the fore that they are among . . . the tens of thousands of Louisianans [who] are convicted felons would subject them to severe stigma or being ostracized is not plausible." (R. Doc. 28 at 4). Defendants go on to suggest that anonymity is "outweighed both by the public's long-standing interest in open and visible litigation and by the duties owed to the class [Plaintiffs'] purport to represent." (R. Doc. 28 at 1). In their Reply, Plaintiffs respond that class-representation and anonymity are not antithetical and that the "nature of relief in this class action weighs in favor of anonymity because Plaintiffs seek resolution of overarching constitutional questions that do not turn on their individual identities." (R. Doc. 36 at 10). The Court agrees.

## II.     LAW AND ANALYSIS

Rule 10(a) of the Federal Rules of Civil Procedure requires that a "complaint must name all the parties." But under some circumstances, "a party may proceed anonymously or under a pseudonym." *Doe v. Griffon Mgmt. LLC*, 2014 WL 7040390, at *1 (E.D. La. Dec. 11, 2014). Whether to allow anonymity "requires a balancing of considerations calling for maintenance of a party's privacy against the customary and constitutionally-embedded presumption of openness in judicial proceedings." *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981). The court may take into account whether the plaintiff: is "challenging the constitutional, statutory or regulatory validity of government activity;" will be compelled to disclose information "of the utmost intimacy;" or "ha[s] to admit that they either had violated state laws . . . or wished to engage in prohibited conduct." *Southern Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979).

### A.     Factors Weigh in Favor of Anonymity

Here, Defendants have all been sued in their official capacities, and Plaintiffs are certainly challenging the constitutional validity of government activity — i.e., Defendants' application of Louisiana's expungement laws — which supports anonymity. *See Doe v. Harris*, 2014 WL 4207599, at *2 (W.D. La. Aug. 25, 2014) ("[M]any of the cases allowing plaintiffs to proceed anonymously involve challenges to the constitutional, statutory, or regulatory validity of government activity."); *Rose v. Beaumont Independent Sch. Dist.*, 240 F.R.D. 264, 266–67 (E.D. Tex. 2007) ("Whether the defendant is a governmental entity or a private defendant is significant because governmental bodies do not share the concerns about 'reputation' that private individuals have when they are publicly charged with wrongdoing."). Moreover, like many cases challenging the constitutionality of government action, this case is "largely legal in nature, and so knowing the Plaintiffs' identities lends little to the public's ability to follow the proceedings or understand the disposition of the case." *Doe v. City of Apple Valley*, 2020 WL 1061442, at *2 (D. Minn. Mar. 5, 2020). And while Plaintiffs' criminal convictions are not 'of the utmost intimacy,' as the Court explains below, there is a real privacy interest at stake in this litigation[2] and a serious risk of harm if Plaintiffs proceed under their full names. *See Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (court should "carefully review all the circumstances of a given case and then decide whether the

---

[2] Defendants argue there is no need for anonymity to protect Plaintiffs from their "already-public-record convictions," and that there is no privacy interest in a person's criminal history. (R. Doc. 28 at 1, 4-5) (citing *Lott v. City of Lubbock, TX*, 184 F.3d 819, at *2 (5th Cir. 1999) (Because "criminal histories are *matters of public record* . . . no constitutional privacy interests exist." (emphasis added))). But Defendants' argument wholly ignores the point of this lawsuit — to obtain expungement of Plaintiffs' criminal records. Defendants are correct that those records are currently public, but this is because Plaintiffs are allegedly unable to afford the roughly 2 to 5 thousand dollars it would take to expunge them. In Louisiana, once criminal records are expunged, they become confidential and unavailable to the public. *See* La. C. Cr. P. art. 971(1)-(2) ("Obtaining an expungement of these records allows for the removal of a record from public access . . . . An expunged record is confidential."). It is that privacy interest — an expunged criminal record — which Plaintiffs seek to obtain in this lawsuit, and which warrants anonymity from the start. Indeed, any other result would thwart the purpose of Louisiana's expungement laws. *See T.S.H. v. Nw. Missouri State Univ.*, 2019 WL 5057586, at *2 (W.D. Mo. Oct. 8, 2019) (granting anonymity where "revealing Plaintiffs' identities in this lawsuit would defeat the protections afforded" by state statute that kept juvenile records confidential).

customary practice of disclosing the plaintiff's identity should yield to the plaintiff's privacy concerns."). As for the third factor, Plaintiffs' Complaint reveals that each has prior criminal arrests and convictions that allegedly qualify for expungement, also favoring anonymity. *Stegall*, 653 F.2d at 186 (The third factor concerns whether the plaintiffs have made "revelations . . . that are shown to have invited an opprobrium analogous to the infamy associated with criminal behavior."). And so, the Court finds the factors outlined by the Fifth Circuit generally weigh in favor of anonymity.

But while these factors deserve consideration, "none . . . are dispositive." *Doe v. Compact Info. Sys., Inc.*, 2015 WL 11022761, at *3 (N.D. Tex. Jan. 26, 2015). Put simply, there is "no hard and fast formula." *Stegall*, 653 F.2d at 186. "In the end, the primary concern underlying the relevant factors is whether the plaintiff likely would suffer *real and serious harm* if she were not permitted to use a pseudonym." *Doe v. Harris*, 2014 WL 4207599, at *2 (W.D. La. Aug. 25, 2014) (emphasis added). The Court answers this question in the affirmative.

### B. Injury Litigated Against Will be Incurred by Disclosure of Plaintiffs' Names

"Lawsuits are public events. [And] a plaintiff should be permitted to proceed anonymously only in those exceptional cases . . . [including,] where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992). In *Roe v. Ingram*, the Southern District of New York allowed the plaintiffs to proceed under fictitious names because they were challenging a state statute that required "their identification to a governmental agency as a condition to receiving" prescriptions for certain controlled substances. *Roe v. Ingraham*, 364 F. Supp. 536, 541 (S.D.N.Y. 1973). The court therefore granted the plaintiffs' request for anonymity, explaining:

> Here, however, if plaintiffs are required to reveal their identity prior to the adjudication on the merits of their privacy claim, they will already have sustained the injury which by this litigation they seek to avoid.

*Ingraham*, 364 F. Supp. 536, 541 n.7. The circumstances of this case warrant a similar result.

Here, Plaintiffs claim that the presence of expungable events on their criminal records "limits their employment and housing options," and they seek "injunctive relief that prevents Defendants from denying access to expungements solely because they cannot afford the high fee." (R. Doc. 3-1 at 2); (R. Docs. 1-1 to 1-3) (Plaintiffs allege they have been denied employment on numerous occasions due to their criminal records that qualify for expungement). To be clear, the remedy Plaintiffs seek from this Court would allow them to expunge qualifying events from their criminal records so that they might obtain more gainful employment and, by extension, better lives.

The Court agrees with Plaintiffs that "[p]roceeding under their full names would forever link their names" with the expungement of criminal records sought in "this civil litigation," thereby "put[ting] the exact information they seek to expunge within reach of a simple internet search by an employer or landlord." (R. Doc. 3-1). *See Doe v. Alger*, 317 F.R.D. 37, 42 (W.D. Va. 2016) ("If he were not allowed to proceed anonymously, part of the relief he seeks — expungement of his student record — would fall short of making him whole: the cat would have already been let out of the bag."); *United States Dep't of Justice v. Utah Dep't of Commerce*, 2017 WL 963203, at *1 (D. Utah Mar. 10, 2017) ("The court finds Doe Intervenors . . . should be allowed to proceed using pseudonyms. Doe Intervenors intervened here to assert their constitutional right to privacy in records contained in Utah's Controlled Substance Database . . . . their attempt to assert a reasonable expectation of privacy could injure the right they seek to protect."); *Doe v. O'Neill*, 1987 WL 859818, at *1 (R.I. Super. Jan. 6, 1987) (Where "[Plaintiff] claim[ed] that the disclosure of [her chlamydia and gonorrhea diagnoses] ha[d] . . . violated her right to privacy" and caused her injury,

she was allowed to proceed anonymously because if her identity were revealed in this lawsuit, she would again incur the injury this litigation seeks to remedy.); *Doe v. Harris*, 640 F.3d 972, 974 (9th Cir. 2011) ("We have allowed Doe to continue to proceed under a pseudonym because drawing public attention to his status as a sex offender is precisely the consequence that he seeks to avoid by bringing this suit.").

### C.     The Perceived Harm is Serious and Substantiated

Plaintiffs contend that "[p]ublic identification of the named Plaintiffs as individuals with criminal records imposes a serious stigma and limits access to jobs and housing." (R. Doc. 3-1 at 4). Specifically, even if they succeed in this litigation, thereby obtaining expungement, future employers will nonetheless learn that they were the named Plaintiffs in a case involving the expungement of criminal records through a simple internet search. (R. Doc. 3-1 at 4). Defendants, ignoring the realities faced by criminal offenders reentering the community, describe the alleged harm as "not plausible." (R. Doc. 28 at 4 n.1). It is plausible, indeed.

First, there is ample evidence that applicants are consistently denied employment opportunities based on their criminal records. The Plaintiffs in this litigation cite to specific and numerous instances in which each of them has been denied employment or otherwise terminated as a result of a criminal background check. (R. Doc. 1-1 at 1) (In 2019, E.B. applied to work at Hamilton Relay and Lyft, but was denied because of his criminal background); (R. Doc. 1-2 at 1) (D.W.'s criminal history precluded employment at Harrah's Casino, Loews Hotel, and Maison St. Charles. In 2019, D.W. was hired by CVS, only to be terminated "during training when they got the results of [D.W.'s] background check."); (R. Doc. 1-3 at 1) (T.R. has been denied employment with Uber, Woldenberg Village Nursing Home, and Courtyard by Marriott-Gretna because of his criminal record). Plaintiffs' past experiences render the alleged harm far from hypothetical. *Cf.*,

*Doe v. Village of Deerfield*, 819 F.3d 372, 375-77 (7th Cir. 2016) (plaintiff sued for malicious prosecution, claiming he was charged with (and later acquitted of) a crime based on witness testimony known by the prosecutor to be false; although charge had been expunged, court denied motion to proceed anonymously where only harm claimed by plaintiff was hypothetical — i.e., "potential embarrassment").

Consistent with Plaintiffs' own experiences, the Louisiana legislature recognized that the "inability to obtain expungement can prevent certain individuals from obtaining gainful employment" and noted their "intention" was for the state's expungement laws to "break [this] cycle." La. C. Crim. P. art. 971(4), (6) (Expungement will "assist the growing population of criminal offenders reentering the community to establish a self-sustaining life through opportunities in employment.").

Indeed, the use of criminal background checks by employers is widespread and the information uncovered often results in the denial of employment opportunities. *See* U.S. Equal Employment Opportunity Commission, Enforcement Guidance No. 915.002, *Considerations of Arrest and Conviction Records in Employment Decisions* (April 25, 2012) ("In one survey, a total of 92% of responding employers stated that they subjected all or some of their job candidates to criminal background checks."); Johnathan J. Smith, *Banning the Box but Keeping the Discrimination?: Disparate Impact and Employers' Overreliance on Criminal Background Checks*, 49 HARV. C.R.-C.L. L. REV. 197, 202 (2014) ("millions of Americans find themselves in situations . . . where they are denied jobs for which they are qualified due to information uncovered on a criminal background check"); Amanda Johnson, *Challenging Criminal Records in Hiring Under the Americans with Disabilities Act*, 48 COLUM. HUM. RTS. L. REV. 211, 211–12 (2017) ("One-hundred million Americans live under the shadow of a criminal record. It is a branding that

limits a broad range of opportunities and stands in the way of full membership in civil society . . . . Perhaps the most painful civil penalty . . . is the long-term damage it inflicts on employment prospects. With over 90% of employers currently conducting criminal background checks, and a majority of employers articulating reluctance to hiring . . . a former offender, those haunted by pasts of . . . criminal justice involvement frequently find themselves locked out of the job market and shunted to the sidelines of American society.").

Beyond that, Plaintiffs' concern that future employers will learn of their involvement in this lawsuit through a simple internet search is entirely reasonable. The use of search engines by employers to investigate job applicants has been a growing for years. *See* Katherine A. Peebles, *Negligent Hiring and the Information Age: How State Legislatures Can Save Employers from Inevitable Liability*, 53 WM. & MARY L. REV. 1397, 1398 (2012) ("One 2010 study commissioned by Microsoft found that 78 percent of recruiting and human resources personnel use search engines to evaluate potential employees, and 63 percent visit social networking sites as part of the screening process."); *Zweizig v. Northwest Direct Teleservices, Inc.*, 2017 WL 3725184, at *5 (D. Or. Aug. 29, 2017) ("[I]t is reasonable to assume that any prospective employer may conduct an internet search of a job applicant before making a job offer."); Susan Park, *Employee Internet Privacy: A Proposed Act That Balances Legitimate Employer Rights and Employee Privacy*, 51 AM. BUS. L.J. 779, 780 (2014) ("The number of employers who search the Internet for information about job applicants and employees has been on the rise for years. This phenomenon has been widely reported and is almost universally considered to be legally permissible."); Saby Ghoshray, *The Emerging Reality of Social Media: Erosion of Individual Privacy Through Cyber-Vetting and Law's Inability to Catch Up*, 12 J. MARSHALL REV. INTELL. PROP. L. 551, 561 (2013) ("[T]he emerging phenomenon of cyber-vetting . . . is shaping the future of employment relationships.

Some reports suggest that as many as eighty percent of employers use social media to screen applicants."); Robert Sprague, *Googling Job Applicants: Incorporating Personal Information into Hiring Decisions*, 23 LAB. LAW. 19, 40 (2007) ("[T]he number of employers using the Internet to investigate job candidates expands, and the number of employers using information from the Internet to make hiring decisions increases . . . ."); *see also Bing v. Brivo Sys., LLC*, 959 F.3d 605, 609 (4th Cir. 2020) ("Within an hour of starting orientation, Wheeler approached Bing and confronted him about a Baltimore Sun article that Wheeler had found after running a Google search on Bing. The article reported Bing's tangential involvement in a shooting for which he faced no charges. Wheeler . . . terminated him on the spot, and escorted Bing out of the building."); *Doe v. Franklin Bank, S.S.B.*, 2008 WL 11334179, at *4 (W.D. Tex. Sept. 3, 2008) (The court would allow plaintiff to proceed under a pseudonym where "Plaintiff's complaint makes clear the core of this case is the reaction of his former employer to disclosure of details concerning his medical condition. He asserts his prior experience makes him reasonably concerned that additional public disclosure of this information could effect [sic] his dealings with future employers.").

Because Plaintiffs have cited their fear of a severe harm that would accompany disclosure of their identities, and that fear is reasonable, anonymity is warranted. *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011) (stating a party may proceed anonymously if they show "both (1) a fear of severe harm, and (2) that the fear of severe harm is reasonable.").

### D. Potential for Class Action Does Not Warrant A Different Result

Defendants alternatively argue that Plaintiffs' request for class certification "necessarily requires disclosure of their identities." (R. Doc. 28 at 5). Without public disclosure of their full names, Defendants suggest, "neither the Court, Defendants, nor — most importantly — the absent class members can evaluate the named Plaintiffs' adequacy as class representatives." (R. Doc. 28

at 5). Relying on cases involving suits for monetary damages against private companies, Defendants ultimately proclaim: "Plaintiffs argue that they should be allowed to speak for others, but then they refuse to even let those other know who is speaking for them." (R. Doc. 28 at 6). Defendants, however, miss the mark.

First, the cases Defendants rely on are both inapposite — this is "a non-monetary putative class action challenging government action" — and unpersuasive. (R. Doc. 36 at 8). For example, in *Ashley Madison*, on which Defendants primarily rely, the court found anonymity inappropriate where plaintiffs sought to represent "a class of consumers" against a private corporation for monetary damages and would "receive an incentive award . . . for work done on behalf of the class." Moreover, the court allowed any class representatives to become class members, should they not want to disclose their identities, and held open the possibility of revisiting its decision if that left a subclass of plaintiffs without a named representative. *See In re Ashley Madison Customer Data Sec. Breach Litigation*, 2016 WL 1366616, at *4-5 (E.D. Mo. April 6, 2016) (court would require identification of class representatives in claim for monetary damages associated with breach of user data on website used to facilitate extra-marital affairs, noting the fiduciary obligation of class representatives and the fact that they "generally receive an incentive award as compensation for work done on behalf of the class."). The two remaining cases cited by Defendants also include causes of action for monetary damages against private corporations. But even more critical, the courts in those cases did not depend on, or even discuss, the plaintiff's request for a class action. *Michael v. Bloomberg L.P.*, 2015 WL 585592, at *3 (S.D.N.Y. Feb. 11, 2015) (Here, the court's decision was wholly unrelated to plaintiff's request for collective action under the FLSA. Instead, the court found plaintiff's fear of reputational harm unsubstantiated and insufficient: "To depart in this case from the general requirement of disclosure would be to hold

that nearly any plaintiff bringing a lawsuit against an employer would have a basis to proceed pseudonymously. The court declines to reach such a holding."); *Doe v. Hartford Life & Accident Ins. Co.*, 2005 WL 8175595, at *2 (D.N.J. Dec. 15, 2005) (denying anonymity largely due to inadequate briefing by plaintiff — he did not even "address the public interest in knowing his identity" — and because the "[s]ensitivity of his mental health condition in and of itself" was insufficient, while only mentioning plaintiff's request for class certification in a single sentence and not offering any analysis or reasoning on the issue).

Contrary to Defendants' assertions, Plaintiffs' request for class certification does not weigh against anonymity under the circumstances of this case. Plaintiffs may potentially represent not only themselves, but the allegedly thousands of Louisianans unable to afford expungement of their otherwise qualifying criminal records. The constitutional issues presented here are legal in nature, and the public interest is therefore "not in being able to identify any one Plaintiff, but in being able to follow the case to determine how the constitutional issues are resolved." *Does v. City of Indianapolis, Ind*, 2006 WL 2289187, at *3 (S.D. Ind. Aug. 7, 2006); *see also EW v. New York Blood Ctr.*, 213 F.R.D. 108, 111 (E.D.N.Y. 2003) ("[I]n a class action context challenging governmental action, the individual defendant's personal characteristics (such as credibility) are generally not in issue," and the "plaintiff's interest in proceeding anonymously is particularly strong."); *Doe v. City of Apple Valley*, 2020 WL 1061442, at *3 (D. Minn. March 5, 2020) (same). Moreover, because Plaintiffs "anticipate no monetary award for their time and effort as class representatives, but merely a vindication of what they allege to be a violation of their rights," *City of Apple Valley*, 2020 WL 1061442, at *3, the concerns raised by Defendants are not present here. (R. Doc. 28 at 4-5).

### E. Plaintiffs Must Disclose their Identities to Defendants and the Court

Finally, Defendants raise legitimate concerns about their ability to defend against Plaintiffs' claims "without knowing who their opponents are." (R. Doc. 28 at 9-10) (claiming total anonymity will preclude Defendants from conducting discovery and assessing both standing and adequacy of representation under Rule 23). But any potential prejudice can be alleviated by the disclosure of Plaintiffs' full names to both the Court and Defendants. By doing so, the Court will be able to "ensur[e] the Plaintiffs are fair representatives of the proposed classes," should a motion for certification be refiled. *City of Apple Valley*, 2020 WL 1061442, at *3. Moreover, Defendants ability to conduct discovery, assess standing, and respond to any potential motion for class certification will not be impeded.

The Court also notes that Plaintiffs represent they "are willing to provide their identities to the Defendants for the purposes of discovery and assessment of their adequacy as class representatives by the Court . . . so long as that revelation is subject to a protective order." (R. Doc. 36 at 11). Therefore, Plaintiffs will eventually be required to disclose their identities in the record under seal, but only after a protective order has been entered by the Court.

### III. CONCLUSION

For the reasons given above, Plaintiffs' Motion to Proceed Anonymously (R. Doc. 3) is **GRANTED** and Plaintiffs will **publicly proceed** in this litigation under the **initials** E.B., D.W. and T.R.

The **parties** are **ORDERED** to **confer** within **7 days** of the Order on the language of a **proposed protective order**. The parties should make every possible effort to **agree** on a **jointly proposed** protective order that allows for the disclosure of Plaintiffs' identities to Defendants and the Court, while preventing the public dissemination of that information.

Within **14 days** of this Order, **Plaintiffs** are **ORDERED** to file the proposed **protective order** in the record for the Court's consideration. If the parties **cannot agree** on the proposed protective order, **Defendants** will have **7 days** to **respond** to Plaintiffs' filing.

Finally, within **3 days** of the Court's **entry** of a protective order, **Plaintiffs** must file their **identities** in the record **under seal**.

Signed in Baton Rouge, Louisiana, on September 28, 2020.

**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**